# Exhibit 1

E-FILED; Baltimore County Circuit Court
Docket: 10/23/2026 2:47 PM; Submission: 10/23/2026 2:47 PM
Envelope: 28847188

**IN THE CIRCUIT COURT FOR**
**BALTIMORE COUNTY**

DARRELL BOWEN
7845 Schooner Drive
Lusby, MD 20657

DIANE BOWEN
7845 Schooner Drive
Lusby, MD 20657

SAKIA RENEE BROWN
827 Ivydale Avenue
Reisterstown, MD 21136

on behalf of themselves and all similarly situated persons,

Plaintiffs,

v.

POINT DIGITAL FINANCE, INC dba POINT
444 High Street, Fl 4
Palo Alto, CA 94301
Serve on:
The Corporation Trust, Inc.
Resident Agent
2405 York Road, Suite 201
Lutherville-Timonium, MD 21093-2264

POINT TITLING TRUST
444 High Street, Fl 4
Palo Alto, CA 94301

Serve on:
Wilmington Savings Fund Society, FSB
Registered Agent
500 Delaware Avenue, 11th Floor
Wilmington, DE 19801

Defendants.

Civil Action No. C-03-CV-26-005002

**JURY TRIAL DEMANDED**

**CLASS ACTION COMPLAINT AND JURY DEMAND**

Plaintiffs Darrell Bowen, Diane Bowen, and Sakia Brown, on behalf of themselves and an entire class of persons similarly situated, pursuant to Md. Rule 2-231 and by undersigned counsel, file this Class Action Complaint against Defendants Point Digital Finance, Inc. dba Point ("Point Digital" or "Point") and Point Titling Trust ("Point Trust" or "the Trust") and state the following:

## NATURE OF THE ACTION

1. This is a class action arising from Point Digital's use of predatory mortgage lending practices structured in a manner designed to circumvent the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, et seq. Point Digital offers borrowers residential mortgage loans, without properly identifying them as such, and does so without providing the disclosures and protections that federal law requires.

2. Point Digital offers what it describes as a Home Equity Investment ("HEI"). It specifically advertises that there are "No monthly payments. No income requirements. No need for perfect credit." *See* Point HEI Homepage, https://point.com/hei (Last visited 10/22/2026) a copy of which is attached hereinafter as Exhibit 1. It explains that Point Digital pays "1…. a **lump sum cash payment** and in exchange, Point gets a slice of your home equity. 2. **There are no monthly payments.** You can buy back your equity at any time within a 30-year term with no penalty. 3. When you decide to buy back your equity, the amount you pay back depends on the value of your home. If your home's value goes up, Point shares in the gain. If the value falls, your buy back costs may be smaller." *Id.* (emphasis in original).

3. Maryland has already defined precisely this type of transaction a "residential mortgage loan" as defined by 15 U.S.C. § 1602(dd)(5) and Md. Code Ann. Fin. Inst. § 11-501(m)(2), because it is a consumer credit transaction secured by a mortgage and deed of trust on the consumer's dwelling. Indeed, Point Digital's own transaction documents identify it as a

"Mortgage Lender." Bowen Shared Appreciation Chart, Exhibit 2B, Brown Shared Appreciation Chart, Exhibit 3B,

4. As a matter of practice, Point Digital holds itself and its HEI out to the public as an alternative to other loan options. Its advertising compares the HEI with traditional home equity lines of credit ("HELOCs"), reverse mortgages, and private loans. And Point Digital affirmatively states that there are "no income requirements," "no monthly payments," and "no need to pay off your 1st Mortgage." *Id.*

5. Buried at the bottom of the HEI homepage, Point Digital finally explains what an HEI really is:

> Point partners with and invests alongside the homeowner in the property. Subject to underwriting approval, Point will pay you an upfront, lump sum amount in exchange for a portion of your home's future appreciation. Future appreciation is based on using the risk adjusted Appreciation Starting Value and calculating any gain or loss based on the final appraised value of your home at the time of exit. Point charges up to a 3.9% processing fee (subject to a $2,000 minimum) and other third party paid closing costs such as appraisal, escrow, and government fees. The term is 30 years. Point will place a lien on your home to secure performance of the underlying agreement. There are no monthly payments or interest accrual. Homeowner's repayment amount is based on the future value of the subject property at the time of exit, as outlined in the underlying agreement.

*Id.*

6. Whatever label Point Digital affixes to it, the transaction is a mortgage loan: Point Digital advances money to a homeowner, secures the obligation to repay with a recorded deed of trust on the homeowner's residence, and collects repayment of the advance plus a substantial charge – due in a single balloon payment upon sale, default, or the end of a thirty-year term – all on pain of foreclosure.

7. Point Digital shepherds prospective borrowers through the process of entering its loan agreements and securing their contractual commitments while choosing not to make the disclosures required by TILA, which include, but are not limited to notifying each borrower of the finance charge expressed as an "annual percentage rate;" the sum of the amount financed; the number, amount, and due dates or period of payments scheduled to repay the total of payments; the total amount of interest that the consumer will pay over the life of the loan as a percentage of the principal of the loan; and the requirement that the creditor provide the annual percentage rate in conspicuous type font.

8. Furthermore, Point Digital not only fails to conduct the necessary investigation to confirm that borrowers had the ability to repay the debt, but it also specifically advertises a reduced emphasis on the borrower's credit score and no need to demonstrate any level of income.

9. Compounding its improper practices, Point Digital attempts to circumscribe borrowers' rights to protect the interest in their homes in court by mandating arbitration as the sole procedural remedy—a requirement that federal law flatly prohibits in a residential mortgage loan, 15 U.S.C. § 1639c(e)(1), and by including improper and unenforceable class action and jury trial waivers.

## **JURISDICTION AND VENUE**

10. This Court has subject matter jurisdiction over this action pursuant to Md. Code Ann., Cts. & Jud. Proc. §§ 1-501 and 3-403(a). States have concurrent jurisdiction with federal courts to hear cases brought under TILA. 15 U.S.C. §1640(e).

11. This Court has personal jurisdiction over the parties. Personal Jurisdiction over Point Digital is appropriate pursuant to Md. Code. Ann. Cts. & Jud. Proc. § 6-103(b)(1) and (5) because it transacts business in Maryland and engages in residential mortgage lending related to

properties located in Maryland, and personal jurisdiction is appropriate over Point Trust because it holds recorded security interests in the same Maryland real property.

12. Venue is proper in this Court pursuant to Md. Code Ann. Cts. & Jud. Proc. § 6-201(a) because: (i) a substantial part of the conduct, events, and omissions giving rise to the claims occurred within Baltimore County; (ii) Point Digital carries on regular business in Baltimore County; and (iii) Point Trust holds deeds of trust on multiple properties located in Baltimore County.

## PARTIES

13. Plaintiffs Darrell L. and Diane L. Bowen are residents of Lusby, Maryland.

14. Plaintiff Sakia Renee Brown is a resident of Reisterstown, Maryland.

15. Defendant Point Digital is a corporation organized in Delaware, with its principal place of business in Palo Alto, California, and it is a Mortgage Lender licensed in Maryland (NMLS ID #1610752).

16. Defendant Point Titling Trust is a Delaware statutory trust. Point Digital assigned all rights, title, and interest in and to the Plaintiffs' Point Contracts to the Trust, and the Trust is named assignee beneficiary under the deed of trust recorded against Plaintiffs' homes. Defendant Point Trust is liable for all acts and omissions of Defendant Point Digital as its assignee.

## FACTUAL ALLEGATIONS

### A. Point Digital Contract

17. Point Digital's contracts are lengthy, convoluted, and extremely difficult – if not impossible - for a layperson to understand.

18. The documents typically consist of a thirty page "Option Purchase Agreement," including multiple appendices, a twenty-four page security instrument, and a myriad of other documents totaling more than 100 pages (collectively, the "Loan Documents").

19. The documents contain multiple cross-references, use dozens of defined terms specific to Point's HEI product, and are replete with run-on and confusing statements and clauses. Copies of Plaintiffs' Point Contracts are attached hereto as Exhibits 2A and 3A respectively.

20. Each Point Digital "Option Purchase Agreement" (the "Point Contract") contains four core components:

a. Cash Advance: Point provides upfront cash to homeowners without requiring documentation or underwriting of income, employment, or assets other than the borrower's home. Point Digital refers to this cash as the "Investment Amount" rather than what it really is: the loan principal.

b. Equity Devaluation: Point Digital acquires a percentage equity interest (usually over 50%) in the borrower's home. Point hand selects an appraiser to value the home. But Point does not use the appraised value for setting how much of increase in home value occurs, it artificially creates a no-lose spread as it calculates the maximum consideration it would ever pay for that interest based on a substantially reduced home value—far below the home's actual worth—and even Point's appraisal—at closing ("PD Equity Spread"). In the Plaintiffs' cases, Point discounted their homes' appraised values by 27% to calculate the "cost" of its HEI interest. This arbitrary devaluation all but eliminates any risk to Point.

c. "Homeowner Protection Cap:" Point Digital purports to place a limit on the total amount a borrower may have to pay back. In reality, the cap is a phantasm of

protection that only benefits Point Digital by ensuring that it will always realize a significant profit on its "investment" no matter when the borrower pays off the loan.

d. Mandatory Balloon Payment: Point Digital forbids the homeowner from reducing his or her debt obligation by prohibiting any installment or periodic payments during the term of the loan. Instead, at the end of the term, or upon an earlier triggering event, the homeowner must make a single, very large payment to Point Digital. This drastic payment term will require most homeowners to sell their homes to afford this payment—or even face foreclosure.

21. Under the Point Contract, Point Digital purportedly "pays" a sum of money to the homeowner called the "Investment Amount." In reality, Point Digital's "Investment Amount" is a loan on which Point Digital, through its confusing and disclosure-free contract, will realize an absurdly and unreasonably high return.

22. Borrowers repay Point Digital for its "Investment Amount" either when Point Digital exercises its "option" to purchase the excessively high percentage interest in the borrower's home, or when the borrower elects to "repurchase" Point Digital's Option. Under either circumstance, the borrower's outlay is substantial, and Point Digital chooses not to determine whether any borrower has the ability to honor the contract and repay it according to its terms. Instead, Point Digital cares only whether there is sufficient collateral—the value of the borrower's mortgaged home—to cover repayment. This underscores the reality that a home sale is the expected—and likely only—way for Point borrowers to satisfy their payment obligations.

23. The arrangement, notwithstanding Point Digitals' self-serving nomenclature, is a mortgage—not an "option" and Maryland has definitively called it such. *See* 15 U.S.C. § 1602(dd)(5); Md. Code Ann. Fin. Inst. § 11-501(m)(2).

24. Even Point Digital's own transaction documents tell the truth:

a. Its Shared Appreciation Chart identifies Point Digital - under a printed field label – as a "Mortgage Lender," and lists a "Mortgage Lender Phone." Ex. 2B, at 1; Ex. 3B, at 1.

b. The same statements refer to the borrowers having "signed a loan application." *Id.*

c. Both the Point Contract and the deed of trust identify the transaction as originated by an "individual loan originator," identified by name and Nationwide Multistate Licensing System number, on behalf of a "Loan Originator Organization," Point Digital, NMLS ID 1610752, Ex. 2A at 26; Bowen Deed of Trust, Exhibit 2C, at 13; Ex. 3A, at 26; Brown Deed of Trust, Exhibit 3C, at 13.

d. Point Digital's plain-language summary requires borrowers to initial acknowledgements that "I must repay Point within 30 years" and that upon default "Point may foreclose on my home." Bowens About My Point Agreement, Exhibit 2D; Brown About my Point Agreement, Exhibit 3D.

e. The deed grants Point Trust, as assignee of Point Digital, the full array of mortgage lender remedies: a security interest with power of sale, an absolute assignment of leases and rents, a UCC fixture filing, appointment of Point Trust as the borrowers' attorney-in-fact, and detailed default, acceleration, and nonjudicial foreclosure procedures. Ex. 2C §§ 1, 3, 4, 6, 7; Ex. 3C §§ 1, 3, 4, 6, 7.

25. Point Digital required borrowers to pay the fees associated with executing the Point Contract, including a processing fee to Point Digital itself, which reduced the amount of cash the borrowers actually received at settlement.

26. To satisfy their obligations under the contract, and get free of the loan, borrowers must pay Point Digital its "Point Proceeds." The Point Proceeds are, in effect, the loan principal (Investment Amount) plus accumulated interest (the dollar value of Point Digital's equity interest in the property - artificially increased by the PD Equity Spread) all due in one lump sum that virtually no borrower can pay absent selling their homes (voluntarily or via foreclosure) or taking out yet another mortgage for which many cannot qualify. Although Point Digital agrees to pay borrowers an "Exercise Payment" in connection with enforcing the contract and liquidating its interest in the home, the "Exercise Payment" is a predetermined amount that pales in comparison to the proceeds Point Digital collects. And Point never actually "pays" the borrower this money. Instead, the Exercise Payment is but a small deduction/offset of the "Point Proceeds" calculation, which is based on the dollar amount of Point's massive percentage interest in the appreciated home value.

**B. How the mortgage contract works—always to Point's benefit.**

27. A close analysis of how much money a borrower receives under the contract, versus the amount of money the borrower must ultimately pay Point Digital, illustrates the insidious nature of Point's HEI product. As contemplated by Congress and Regulators when TILA was promulgated, this revealing information would be transparent and readily available to the borrowers in the disclosures that TILA requires, but Point Digital chooses not to provide those disclosures to its borrowers.

28. To start, as stated, Point receives a majority equity interest in the borrowers' home—the "HEI percentage." In the Bowens' case, Point's equity interest is a whopping 53.9%. The value of the Bowens' home, as determined by Point's hand selected appraisers, at closing was

$375,000, and therefore Point acquired an equity interest initially worth $202,125.[1] But under the contract, Point will never pay the Bowens that amount as consideration for its interest.

29. Instead, Point pays borrowers a comparatively small sum at closing (the "Investment Amount") and calculates a second sum (the "Exercise Payment") that may or may not be applied to reduce what the borrower must ultimately pay Point. Together, these two sums comprise what Point calls the "Option Consideration"—which is the most money that Point would ever have to pay. But the total "Option Consideration" does not even come close to the value of the interest that Point acquires in the property. This is because, instead of the Option Consideration equaling Point's HEI percentage of the actual home value, Point uses its HEI percentage of an arbitrarily and artificially depressed home value, caused by the PD Equity Spread, which Point calls the "Appreciation Starting Value."

30. In the Bowens' case, to calculate the "Option Consideration," Point conjured up an "Appreciation Starting Value" for their home of just $273,750. That is 27% *less* than what Point's handpicked appraisers said the home was worth at closing. Point then applied its 53.9% HEI percentage to *that* number to arrive at an Option Consideration totaling $147,551.25.[2] From that number, Point allocated $60,000 as the "Investment Amount" payable at closing, and the remaining $87,551.25 as the "Exercise Payment." In other words, at the Bowens' closing, Point *got* an equity interest worth $202,125, but agreed to *give*, at most, $147,551.25—which is $54,573.75 *less* than Point's built in equity. Notably, that $54,573.75 also happens to be 53.9% of the difference between the Bowens' actual home value and the depressed "Appreciation Starting Value." In other words,

---

[1] 53.9% of 375,000 = 202,125.

[2] 53.9% of 273,750 = 147.551.25

Point gave itself almost $55,000 worth of contractual appreciation from the get-go, virtually eliminating its risk.[3]

31. Worse, Point never pays borrowers the full Option Consideration. In the Bowens' case, Point paid them only $55,753.71 of the $60,000 Investment Amount at closing because of closing costs—less than 15% of their home's value. As for whether the Bowens will ever see the $87,551.25 "Exercise Payment," that depends on whether Point cashes out its interest at the 30-year term, or the Bowens decide (or are forced to) repurchase Point's interest at an earlier date.

32. Regardless of when or how Point's option becomes payable, borrowers must, at that time, pay Point its "Point Proceeds"—which are Point's return on its miniscule "Investment Amount" paid at closing. And if Point's calculation of the Option Consideration, Investment Amount, and Exercise Payment is confusing to a lay borrower, its formula for calculating the "Point Proceeds" is exponentially more befuddling.

33. In fact, there are actually two different formulas, with "Point Proceeds" equaling the *lesser* of what each formula yields. The two formulas are (i) the "Capped Repayment Amount" and (ii) the appreciation-based calculation. Point identifies them in a schedule buried among the hundred-plus pages of loan documents, and in a manner that even the most sophisticated borrower would find confusing, as follows:

---

[3] Ms. Brown's transaction operates in precisely the same manner. Point Digital reduced her $320,000 appraised home value by 27% to an Appreciation Starting Value of $233,600, creating an $86,400 gap at origination. Point Digital's 54.2% HEI of that pre-existing gap is $46,828.80. Point received an HEI worth $173,440 but calculated an "Option Consideration" of just $126,611.20.

CALCULATION OF POINT PROCEEDS

A. **Formula for Calculation of Point Proceeds.** Except as otherwise provided in this Agreement, any calculation of the value of the Point Proceeds under this Agreement, the other Option Documents, or otherwise shall be calculated as the total of the following (**"Calculation of Point Proceeds"**):

**Point Proceeds** = Lesser of {**Capped Repayment Amount** and [(**Final Home Value** × **HEI Percentage**) – **Exercise Payment**]} + **Service Fees**† + **Preservation Payments**†

† if applicable

B. **Calculating the Capped Repayment Amount.** The Calculation of the Point Proceeds takes into account the Capped Repayment Amount, which may limit the amount an Owner is obligated to pay to Point. The Capped Repayment Amount is calculated as follows:

**Capped Repayment Amount** = **Investment Amount** × [1 + (**Homeowner Protection Cap** / 12)]$^{M}$

where M, used as an exponent, represents the number of months (including partial months) that have fully elapsed since the Effective Date.

*See* Exs. 2E and 3E, Schedule 2, "Calculation of Point Proceeds."

34. As stated earlier, Point touts that its contract includes a "Homeowner Protection Cap" that limits the total amount a borrower must pay Point. But a closer look at this "cap," and how it is calculated, reveals that it is hardly a cap in the first instance, and that its cost quickly outpaces that of Point's alternative, appreciation-based formula, thus providing very limited "protection."

35. Returning to the Bowens, Point's contract identifies a "Homeowner Protection Cap" of 17.5%. Recall that the Bowens received only $55,753.71 at closing. Under Point's "Capped Repayment Amount" formula, if the Bowens had a change of heart and decided to end the contract and repurchase Point's interest within the first month, they would owe Point $60,875. At one year the Bowens would have to pay $71,384. And at 5 years, $143,025. What Point did not disclose to the Bowens is that its "Homeowner Protection Cap" formula all but guarantees Point an **18.97%** rate of return on its "Investment Amount." Thus, at 15 years, the "Protection Cap" is $812,721, and at 30 years it is a staggering $11+ Million, all for the receipt of $53k.

36. Assuming a 30-year average annual home value appreciation rate of 4.13%,[4] the Capped Repayment Amount will exceed the Appreciation-based amount after year 6. Thus the "cap" really protects Point—not the borrower—because it guarantees Point a hefty return on its money in the short term.[5] Point never discloses this.

37. Under the alternative, Appreciation-based formula for calculating Point Proceeds, and assuming the above 4.13% annual home appreciation rate, the Bowens would owe Point $215,404 in 10 years, $366,534 in 20 years, and $593,055 in 30 years—all to repay Point for receiving less than $56,000.[6] The reality is that neither the Bowens, nor any other Point borrower, will be able to pay these Point Proceeds when due. They will have to sell their home to raise the cash—and at the same time bear sole responsibility for fees and closing costs of *that* transaction, not shared by the supposed equity partner, thus exacerbating the economic burden Point's HEI put upon them. And if they are somehow fortunate enough to find a lender who will refinance, their 30-year debt horizon begins anew.

---

[4] According to data published by the Federal Housing Finance Agency, Maryland's All-Transactions House Price Index increased from 214.49 in the second quarter of 1996 to 722.18 in the second quarter of 2026, an increase of approximately 236.7%, equivalent to an average compounded annual appreciation rate of approximately 4.13%. *See* U.S. Federal Housing Finance Agency, All-Transactions House Price Index for Maryland (MDSTHPI), Federal Reserve Bank of St. Louis, FRED, https://fred.stlouisfed.org/data/MDSTHPI (last visited Oct. 13, 2026) (annualized appreciation calculated from published index values).

[5] Ms. Brown's "Homeowner Protection Cap" was 18%, which means that the "Capped Repayment Amount" formula guaranteed Point a ***<u>19.56%</u>*** return. Given such a favorable return, it is not surprising that, to this day, Point Digital continues to contact Ms. Brown to solicit her to take out another loan based on the remaining equity in her home.

[6] Point's explanation of this formula breeds even more confusion. In Schedule 2 (image reproduced above) Point defines the formula as "[(Final Home Value x HEI Percentage) – Exercise Payment]." But in the very same loan documents it provides to borrowers, Point defines the formula as "the Investment Amount plus Point's share of your home's appreciation (the HEI Percentage) between the Appreciation Starting Value and the Final Home Value." (*See* "Important Information Regarding Your Shared Appreciation Transaction," at p.2 of 10). Although both formulae produce the same result, Point chose—inexplicably—to use two different algebraic expressions of the same economic relationship. This is the antithesis of TILA's stated purpose providing clear disclosures to enable consumers' informed use of credit. 15 U.S.C. §1601(a).

38. Ms. Brown is in the same boat. Under Point's appreciation-based formula for calculating Point Proceeds, and assuming the same 4.13% home appreciation rate, Ms. Brown would owe Point $181,349.65 at 10 years, $311,031.58 at 20 years, and $505,405.57 upon expiration of the contract.

39. Under Point's one-sided deal, Point acquired majority equity interests in the Plaintiffs' homes that Plaintiffs must pay out at contract termination to the tune of over half a million dollars (Ms. Brown) and nearly $600,000 (the Bowens). And Plaintiffs must pay this even though they only received a paltry $44,333.71 and $55,753.71, respectively.

40. Point sold its HEI product to borrowers based on the promise of up-front cash, no monthly payments, and no income verification—without regard to whether any borrower reasonably possessed the ability or wherewithal to pay the Point Proceeds when they became due. Point cared only about the value of each borrower's home, and whether its sale would generate sufficient proceeds to pay Point. In other words, Point, in addition to lack of disclosure violations, violated TILA's requirement to make a good faith determination of each borrower's ability to repay the HEI loan.

**C. Point retains control over borrowers and their homes while assuming none of the burdens of ownership.**

41. In addition to Defendants collecting the substantial "Point Proceeds" at the end of the loan term or upon borrower's voluntary repayment, they can also force a sale of the property to collect Point Proceeds (and any other associated fees and costs) in the event of any default or other triggering event—of which there are many. *See* Bowen Point Contract, Ex. 2A, ¶¶ 1.4.2, 2.1-2.3, 6.1; Brown Point Contract, Ex. 3A, ¶¶ 1.4.2, 2.1-2.3, 6.1. These triggering events include anything that might transfer the property or any portion of the property, or any "default"—a term Point Digital defines so broadly that it includes "any other action or event … which has, or may

reasonably be expected to have, a material adverse effect on the Property, the value of the property, Point's right to exercise the Option or Point's Rights." *Id.* ¶¶ 1.42; 6.1(o). Thus, a foreclosure-triggering "default" could be anything from a refinance or sale that doesn't have Point's express consent, to not making home repairs, to falling ever so slightly behind on taxes or assessments related to the property. Under any of those circumstances, Point Digital mandates that the borrower "fully cooperate and execute all documents necessary to grant us the exclusive right to market and sell the Property." *Id.*, ¶ 2.2.2.

42. The Point Contract is thus a single-payment residential mortgage loan with a disguised – and exorbitant – finance charge. Even in the unlikely event that the Bowens' and Ms. Brown's house do not appreciate at all, Point Digital all but guarantees itself a substantial profit on the small amount it lent Plaintiffs because (i) it created a "Capped Repayment" formula that produced an exorbitant rate of return; and (ii) it manufactured an instant and massive contractual appreciation value by applying a heavily discounted borrower home value to its appreciation-based repayment formula.

43. Even where a borrower desires to sell his or her property, Point Digital complicates and frustrates the process by mandating advance notice of any intent to sell, notice of any accepted offer, and delivery to Point Digital of all documents relating to the sale, among other procedural hurdles. *Id.*, ¶ 2.1.2.

44. Borrowers are solely responsible for the costs of repair and restoration if the property is damaged, and contrary to most equity partner relationships, Point Digital "shall have no responsibility or obligation to pay any amount whatsoever in connection with the restoration and repair of the Property." *Id.*, ¶ 4.4.1. This is further evidence that Point' HEI is a loan and not an option to buy a future interest because Point Digital expressly disclaims any obligation under

the law of contribution. *See generally, Crawford v. Crawford*, 293 Md. 307, 309, 443 A.2d 599 (1982) ("Generally, one co-tenant who pays the mortgage, taxes, and other carrying charges of jointly owned property is entitled to contribution from the other.")

45. Borrowers are required to pay all service fees imposed by Point Digital and to maintain insurance at their own expense, and if borrowers fail to protect the property to Point Digital's specifications, Point Digital retains the right to take corrective action and then charge borrowers 8% interest on any money Point Digital chooses to spend. *Id.*, ¶¶ 4.1.1, 4.1.4, 4.2.2.

**D. Point Digital's Advertising Employs Messaging Directed at Vulnerable Homeowners**

46. Point Digital's homepage tells homeowners they can "keep the home you love," while the Point Contract's structure and eventual payoff obligations will leave most homeowners with no practical means of satisfying the debt other than selling their home.

47. Point Digital targets its products to financially strained homeowners by emphasizing the absence of monthly payments and income requirements, as well as the availability of the product to borrowers without perfect credit. *See* Ex. 1, Point Digital Website, https://point.com/hei. It emphasizes that its product grants borrowers "freedom to breathe" and allows them to pay off high-interest debt while obscuring the substantial sum borrowers pay in the long run. Such carefully crafted appeals to financially vulnerable homeowners is precisely what TILA's disclosures are designed to counter-balance. Complete and clear disclosure of the HEI's terms and conditions, separate and apart from the language Point employs to draw in consumers—as TILA requires—provides the average borrower with the information he or she needs to make a fully informed decision. These disclosures include, but are not limited to, the finance charge, the annual percentage rate, the amount financed, and the total of payments, in the form, at the time, and with the prominence required by 15 U.S.C. §§ 1632, 1638 and 12 C.F.R. 1026.17-1026.19.

48. Determining a borrower's ability to repay Point under the HEI agreement, especially given the substantial lump sum due at loan maturity or required repurchase, is equally important. But Point chooses never to make such an inquiry.

Companies like Point Digital specifically target homeowners who cannot afford monthly payments and assert that their product will help them receive cash without selling. *See* IPE Webinar: Home Equity Investments: An Untapped Asset Class/Hometap, https://www.youtube.com/watch?v=NabDHTVlp3Y&t=1s (noting that the product appeals to people who "just can't take on… more debt"; later explaining that increased homeowner cost-of-living and inability to take on additional traditional debt "translates into an opportunity for capital… to earn a really strong relative risk adjusted return.") Unlike reverse mortgages, which require independent counseling by a HUD-certified counselor and TILA disclosures revealing the true cost of the loan, Point Digital and other purveyors of HEI products bypass these critical consumer safeguards, leaving borrowers without the independent guidance and financial transparency designed to protect them.

49. In reality, the combination of Point Digital's product and the borrowers it targets creates substantial risk that borrowers will lose their homes during the course of this relationship. In all likelihood, homeowners will need to refinance. The target class of homeowners are individuals "who can't take on … more debt", have low credit scores, and can't get traditional financing. Ms. Brown's and the Bowen's situation are illustrative of these forces. These numbers can be challenging even for people with the cleanest credit history and wage earnings depending on the interest rate at the time. For the borrowers that HEI providers like Point Digital target, refinancing becomes nearly impossible. If a refinancing is required or needed, payoff of Point Digital may be necessary either because the new lender will require it or because Point Digital will

exercise its discretion to mandate it. *See* Exs. 2A and 3A, § 4.1.5 and Exs. 2D and 3D, About My Point Agreement

50. While it purports to share in the borrower's risks, Point Digital has structured the agreement in such a way that all but ensures a profit, including:.

a. Arbitrarily and deeply discounting the appraised value of borrowers' property before determining the terms of the loan, PD Equity Spread.

i. In the Bowens' case, Point Digital applied what it calls a "risk adjustment" of 27%, unilaterally reducing the home's $375,000 appraised value to an "Appreciation Starting Value" of $273,750 – a $101,250 markdown – and then measured its 53.9% share from that depressed baseline. Bowen Closing Statement, Exhibit 2F., at 1. This ensures that even with zero appreciation, whether through the vagaries of the market or because the borrower chooses to pay off the loan well before the thirty-year term, Point Digital is guaranteed to profit from the loan.

ii. In Plaintiff Brown's case, Point Digital applied the "risk adjustment" of 27%, reducing the $320,000 appraised value to an "Appreciation Starting Value" of $233,600 – an $86,400 markdown – and then measured its 54.2% share of "appreciation" from that depressed baseline. Brown Closing Statement, Exhibit 3F, at 1. With the Bowens, and the rest of the putative class, this ensures that even with zero actual appreciation, Point Digital is guaranteed to make a profit from the loan.

iii. The lower starting value serves double duty by protecting Point Digital from the risks of depreciation. Even if the value of the home drops, Point Digital has built a sizable cushion into its calculations. Point Digital's own repayment table proves the point: for the Bowens, in a scenario Point Digital labels as "10% Total Depreciation" – the home falling in value from $375,000 to $337,500 – the borrower nonetheless owes Point Digital $94,361 after five years on a $60,000 loan, because the depressed starting value converts real-world depreciation into contractual "appreciation." Bowen Shared Appreciation Table, Ex. 2B, at 4. Ms. Brown's documents describe a similar scenario: at "10% Total Depreciation" with the home value falling from $320,000 to $288,000 – Ms. Brown would still owe $77,485 on a $48,000 loan. Brown Shared Appreciation Table, Ex. 3B, at 4.

b. Establishing a "Homeowner Protection Cap" that only benefits Point while claiming it benefits borrowers.

i. The capped repayment amount begins with the full Investment Amount and increases according to an annual rate compounded monthly. Point Digital itself explains that this capped amount is typically the lower of the two repayment calculations during the first few years of the Agreement. Thus, during that period, the amount payable to Point Digital can increase simply with the passage of time even if the home experiences no appreciation. For the Bowens, the

appreciation-based repayment produces unchanged Point Proceeds of $114,574 with 0% appreciation of the $375,000. The capped repayment amount begins at $60,875 on day 0 – already $5,121.29 more than the Bowens received – and rises over time until it exceeds $114,574, after which that amount becomes the lower calculation with 0% appreciation. Ex. 2A. Ms. Brown's contract operates in the same fashion: at an unchanged $320,000 home value, the appreciation-based repayment is approximately $94,829, while the capped repayment amount begins at $48,720, and grows with time. Ex. 3A.

ii. The Homeowner Protection Cap is designed to give the borrower a false sense of security that there is a ceiling to what they might owe when, in reality, the amount owed increases so sharply that after just a few years it is highly unlikely that any appreciation in the house will keep up with the rate in which the "cap" increases, It all but guarantees that, even if there is no appreciation, the appreciation based calculations will be used to determine Point Digital's Proceeds within a few scant years. By "coincidence", the Consumer Financial Protection Bureau ("CFPB") has determined that "[o]n average, borrowers keep a mortgage for about five years before moving or refinancing." CFPB, Buying a House – Know the Process, https://www.consumerfinance.gov/owning-a-home/sources/ (last visited October 23, 2026)

c. Requiring the borrower maintain insurance and upkeep on the property.

i. Failure to do so can trigger Point Digital's right to sell the property and to reduce the amount of money owed to the borrower. Bowen Point Contract, Ex. 2A, ¶ 4.4.3; Brown Point Contract, Ex. 3A, ¶ 4.4.3.

ii. By requiring the borrower to carry these financial burdens, Point Digital ensures that any risk of depreciation for reasons outside of ambient market conditions is minimized.

d. Strictly limiting the amount of any other debt the borrower's home can secure, and it prohibits any new lien without its written approval. *Id.* at ¶¶ 4.1.5, 4.1.6; *Id.* at ¶¶ 4.1.5, 4.1.6.

51. When it comes time to establish a property's "Final Home Value" for purposes of calculating the Point Proceeds, Point Digital -- not the borrower – again chooses the appraiser, at the borrower's expense. *Id.* at ¶¶ 4.3.1, 4.3.4; *Id.* at ¶¶ 4.3.1, 4.3.4. Any borrower desiring a second or third appraisal must pay for it, but the Final Home Value for calculation purposes will still factor in the first appraisal and will thus always be anchored to the figure determined by Point's hand-selected vendor. *Id.* at ¶ 4.3.3; *Id.* at ¶ 4.3.3.

52. At no stage in the process does Point Digital determine, based on verified and documented information, whether or not a homeowner can repay Point Digital under the terms of its contract as required by TILA. 15 U.S.C. § 1639c(a). Point Digital makes no assessment of

borrowers' current or reasonable expected income, their simultaneous loans, their current debt obligations, or any of the conditions the CFPB requires lenders to confirm. 12 CFR § 1026.43(c).

53. Point Digital only looks at the value of the home, the borrower's equity in it, and whether the borrower has a passable credit score. Point Digital FAQ, Qualify, Does Point verify my income or employment, https://help.point.com/article/513-does-point-verify-my-income-or-employment (last visited October 23, 2026).

54. The Point Digital Contract also contains unlawful provisions designed to limit the ability of borrowers to vindicate their rights in court, including:

a. A clause mandating borrower-initiated and funded arbitration that federal law prohibits under 15 U.S.C. § 1639c(e)(1). Ex. 2A, ¶ 7.20.1; Ex. 3A, ¶ 7.20.1.

b. The improper requirement that claims can only proceed on an individual basis and not as part of a class action. *Id.* at ¶¶ 7.19, 7.20.6; *Id.* at ¶¶ 7.19, 7.20.6.

c. A prohibited jury trial waiver. *Id.* at ¶7.19; *Id.* at ¶ 7.19; and

d. The disallowance of traditional borrower remedies including punitive and consequential damages. *Id.* at ¶ 7.20.3; *Id.* at ¶ 7.20.3.

55. In other words, by the contract's express terms, Point Digital requires that any borrower who wishes to raise a claim, including the statutory claims at issue here, must pursue arbitration, through a specific organization of Point Digital's choosing, under California law, without a jury or class procedures, and without punitive or consequential damages.

56. Meanwhile, Point Digital is not bound by arbitration when seeking its core remedy against the borrower. Upon a declared default, Point Trust may proceed directly to nonjudicial

foreclosure under the power of sale in the Security Instrument (Bowen and Brown Deeds of Trust Exs. 2C and 3C, § 7), may invoke its rights as attorney-in-fact for the borrower (*Id.* at § 6) and may seek injunctive relief in court under the express carve-out of the contract (Bowen and Brown Point Contracts, Exs. 2A and 3A, ¶ 7.20.4) – all outside of arbitration. Section 2.3.5 of the Option Agreement confirms that Point Digital "retain[s] full discretion to select the appropriate remedy following default, and [is] not obligated to initiate Option Exercise prior to initiating foreclosure proceedings." *Id.*

57. This Complaint further serves as notice to Point Digital of Plaintiffs', and all similarly situated individuals, intent to rescind their Point Contract pursuant to 15 U.S.C. §1635(a).

## FACTUAL ALLEGATIONS RELATED TO THE INDIVIDUAL CLASS REPRESENTATIVES

### Darrell and Diane Bowen

58. Plaintiffs incorporate the above paragraphs as if restated herein.

59. In March of 2020, Darrell and Diane Bowen purchased a home at 7845 Schooner Drive, Lusby, MD 20657.

60. They chose the home with the intention of residing in it for the rest of their lives. They improved and added to the property, through their own sweat and tears, to make it their "forever home."

61. In or around the summer of 2025, Point Digital targeted the Bowens with unsolicited literature advertising its mortgage products.

62. The Bowens subsequently contacted Point Digital, which quickly assigned a Loan Officer to sell them Point's product.

63. Point Digital presented its standardized, non-negotiable contract documents to the Bowens, which afforded them no meaningful opportunity to bargain over, modify, or have any say in its terms.

64. Point Digital's Loan Officer informed the Bowens that they did not need good credit, and that the product would allow them to keep their home. Point Digital further stated that its HEI product did not require any monthly payments, that the Bowens had thirty years to pay back the loan, and that when the time came, the Bowens could simply obtain a refinance to pay their Point Digital obligation.

65. None of the Bowens' interactions with Point Digital's Loan Officer (or anyone from Point) was in person. Every communication, action, and document execution was conducted via telephone or online.

66. After it approved the Bowens' loan, Point Digital provided the Bowens with a closing packet that included fifteen separate documents totaling over 100 pages.

67. Just before the Bowens executed the voluminous documents, Point arranged for "credit counseling" that consisted of a telephone call, barely fifteen (15) minutes long, in which a "counselor" that Point Digital selected, but whom the Bowens had to pay for, asked the Bowens a series of generic questions yet offered no advice or guidance regarding the impact of the loan or the meaning of its terms.

68. The Bowens closed their Point Digital loan on October 27, 2025, with a title company representative, and with no one from Point Digital in attendance.

69. At closing the Bowens granted Point Digital a mortgage on their home documented by a deed of trust that secured their repayment obligation under penalty of foreclosure. Ex. 2A, ¶ 1.5; Ex. 2C.

70. The Point Contract purported to provide the Bowens $60,000 on a home appraised at $375,000, or 16% of the home's value, in exchange for a 53.9% interest in the home's value. Bowen Closing Statement Ex. 2F, at 2; Ex. 2A, ¶ 1.1.

71. Of the $60,000, the Bowens received only $55,754 at closing; the balance was consumed by Point Digital's processing fee, third-party charges (including the purported credit counseling services), and other fees deducted at closing. Ex. 2F, at 2.

72. Point Digital provided the Bowens with a "Shared Appreciation" chart that purported to quantify—in a series of complicated tables—the Bowens' repayment obligation at future dates. Ex. 2B. At no point did Point Digital set forth or otherwise disclose: (i) what the Point Proceeds are or would be; (ii) the interest paid on the loan; or (iii) the Finance Charge.

73. The figures Point Digital supplied to the Bowens estimated that after five years with zero annual appreciation – the home being worth exactly what its handpicked appraisers said it was worth at signing – the Bowens would owe $114,574 on their $60,000 loan: ***a 90% return*** for the lender. Bowen Closing Statement, Ex. 2F, at 4.

74. Additionally, the Bowens are required to pay 100% of the fees and costs associated with contract maturity, including all costs related to any sale or refinance (Ex. 2A, ¶ 2.1.4(d)) as well as any fees or costs that Point Digital incurred over the life of the contract. *Id.* at ¶ 4.1.4.

75. Point Digital chose not to disclose to the Bowens the loan's finance charge, its annual percentage rate, or the amount they financed. Point Digital also chose not to analyze the Bowens' ability to repay the Point Digital loan.

**Sakia Renee Brown**

76. In February of 2017, Sakia Renee Brown purchased a home at 827 Ivydale Avenue, Reisterstown, MD 21136.

77. Ms. Brown previously resided in an apartment in Owings Mills, Maryland when she was a Bachelor's and Master' student at Stevenson University and chose to make her permanent home in nearby Reisterstown because of her affinity for the area. Ms. Brown was one of the youngest homeowners on her block—which was a solid and cohesive community of neighbors, most of whom had resided there for a quarter century.

78. On or around June of 2025, Ms. Brown came across an online advertisement for Point Digital and its mortgage products.

79. Ms. Brown contacted Point Digital which immediately dispatched a Loan Officer to aggressively promote its product and shepherd Ms. Brown through the paperwork necessary to complete the transaction.

80. Point Digital presented its standardized, non-negotiable contract documents to Ms. Brown, which afforded her no meaningful opportunity to bargain over, modify, or have any say in its terms.

81. Point Digital 's Loan Officer informed Ms. Brown that she did not need good credit, and that the product would allow her to keep her home. Point Digital further stated that its HEI product did not require any monthly payments, that Ms. Brown had thirty years to pay back the loan, and that when the time came, Ms. Brown could simply obtain a refinance to pay her Point Digital obligation.

82. None of Ms. Brown's interactions with Point Digital's Loan Officer (or anyone from Point) was in person. Every communication, action, and document execution was conducted via telephone or online.

83. After it approved Ms. Brown's loan, Point Digital provided her with a closing packet that included fifteen separate documents totaling over 100 pages.

84. Ms. Brown closed her Point Digital loan on July 6, 2025, with a title company representative, and with no one from Point Digital in attendance.

85. At closing Ms. Brown granted Point Digital a mortgage on her home documented by a deed of trust that secured her repayment obligation under penalty of foreclosure. Ex. 3A, ¶ 1.5; Brown Deed of Title, Ex. 3C.

86. The Point Contract purported to provide Ms. Brown $48,000 on a home appraised at $320,000, or 15% of the home's value. Brown Closing Statement, Ex. 3F.

87. Of the $48,000, Ms. Brown received only $44,333.71 at closing; the balance was consumed by Point Digital's processing fees, third-party charges, and other fees deducted at closing. Ex. 3F.

88. Point Digital gave Ms. Brown a "Shared Appreciation" chart that purported to quantify – in a series of complicated tables – her repayment obligations at future dates. Ex. 3B. At no time did Point Digital set forth or otherwise disclose (i) what the Point Proceeds are or would be; (ii)the interest paid on the loan; or (iii) the Finance Charge.

89. The figures Point Digital supplied to Ms. Brown estimated that after five years with zero annual appreciation – the home being worth exactly what its handpicked appraisers said it was worth at signing – Ms. Brown would owe $94,829 on her $48,000 loan: ***a 97% return*** for the lender. Ex. 3C.

90. Additionally, Ms. Brown is required to pay 100% of the fees and costs associated with contract maturity, including all costs related to any sale or refinance (Ex. 3A, ¶ 2.1.4(d)) as well as any fees or costs that Point Digital has incurred over the life of the contract. Ex. 3A, ¶ 4.1.4.

91. Point Digital chose not to disclose to Ms. Brown the loan's finance charge, its annual percentage rate, or the amount she financed. Point Digital also chose not to analyze Ms. Brown's ability to repay the Point Digital loan.

## CLASS ACTION ALLEGATIONS

92. Plaintiffs incorporate the above paragraphs as if restated herein.

93. Plaintiffs bring this action on behalf of themselves and all other similarly situated individuals pursuant to Md. Rule 2-231, and the alleged class (the "Point Digital Class") as defined as follows:

> All persons who, from October 23, 2023 to the present, entered into a Point Digital Finance Option Purchase Agreement, or a substantially similar option purchase or home equity investment agreement offered by Point Digital, secured by a Security Instrument encumbering residential real property located in the State of Maryland, and/or assigned to Point Trust.

94. There are questions of law and fact common to the claims of each and all members of the Class. These common questions include, but are not limited to:

a. whether the Point Contract constitutes an extension of consumer credit and a residential mortgage loan;

b. whether the Point Digital HEI products are subject to TILA's disclosure requirements;

c. whether Defendants failed to make disclosures required by TILA;

d. whether the Point Digital HEI products are subject to TILA's requirement to make a good faith determination of a borrower's ability to repay the obligation;

e. whether Defendants failed to make a determination of the Plaintiffs' and Class members' ability to repay before closing their Point Contracts;

f. whether the Point Contract's arbitration clause, class action waiver, and jury trial waiver are void and unenforceable;

g. whether the Plaintiffs and Class Members are entitled to rescission of their agreements, under 15 U.S.C. § 1635 and 12 CFR § 1026.23;

h. whether the Plaintiffs and Class Members are entitled to statutory damages and attorneys' fees under 15 U.S.C. § 1640(a)(1)-(4); and

i. whether the Plaintiffs and Class Members Point Contracts are voidable under Md. Code Ann. Cts. & Jud. Proc §§ 3-409 and 3-412.

95. These common issues of law and fact predominate over any question affecting only individual Class members.

96. Plaintiffs' claims are typical of the claims of the Class members, arise from the same standardized form contract and origination practices, and are subject to the same statutory measure of damages set forth in 15 U.S.C. § 1640(a)(2).

97. Plaintiffs will fairly and adequately protect the interests of the Class. The interests of the named Plaintiffs and the members of the Class are identical.

98. Plaintiffs' counsel has substantial experience in complex litigation and class action proceedings and will adequately represent the Class's interests.

99. The Class consists, upon information and belief, of hundreds of borrowers, and thus is so numerous that joinder of all members is impracticable.

100. Separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendants.

101. Most members of the Class are unaware of their rights to prosecute a claim against Defendants.

102. No member of the Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the Class upon receipt of notice under Maryland Rule 2-231(e).

## COUNT I

**Violation of the Truth in Lending Act (TILA) – Failure to Make Required Disclosures**
**15 U.S.C. §§ 1601 *et seq.*, 1631, 1632, 1638; 12 C.F.R. Part 1026**

103. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

104. The Point Contracts at issue in this action are an extension of consumer credit subject to the Truth-in-Lending Act, 15 U.S.C. § 1601 *et seq.* and its implementing Regulation Z, 12 C.F.R. Part 1026 (collectively, TILA): they grant consumers the right to defer payment of debt – the Point Proceeds – that arises at consummation and becomes due upon sale, transfer, default, or the expiration of the thirty-year term.

105. The Point Contracts at issue are "residential mortgage loans" as defined by 15 U.S.C. § 1602(dd)(5) and Md. Code Ann. Fin. Inst. § 11-501(m)(2), because they are consumer credit transactions secured by mortgages and deeds of trust on the consumers' dwellings.

106. Point Digital bears no meaningful risk of loss on the transactions, and the Point Contracts are therefore credit rather than investment: Point Digital's unilateral markdown of the starting home value, together with its self-serving repayment formulas, guarantee it a recovery exceeding its advance even in substantial depreciation scenarios, and the Homeowner Protection Cap guarantees that Point Digital realizes a substantial return compounded monthly in all events. Exs. 2A and 3A, ¶ 1.1, Exs. 2E and 3E ¶¶ A and B.

107. The Point Contracts require the payment of a finance charge, as the terms are defined in 15 U.S.C. §§ 1602(f) and 1605 and 12 C.F.R. § 1026.4; specifically: the difference between the Investment Amount and the Point Proceeds is a charge imposed as an incident to the extension of credit, as are the processing and other fees that Point Digital deducts from the Investment Amount at closing.

108. As a creditor, Defendant Point Digital was required under TILA to provide each class member with accurate, clear, and conspicuous disclosures, including, without limitation, the finance charge, the annual percentage rate, the amount financed, and the total of payments, in the form, at the time, and with the prominence required by 15 U.S.C. §§ 1632 and 1638 and 12 C.F.R. 1026.17-1026.19.

109. Defendants chose not to provide any of these disclosures.

110. Defendant Point Trust, as assignee, succeeds to the rights and liabilities and is jointly and severally liable under 15 U.S.C. § 1641 for all acts and omissions pleaded herein.

**COUNT II**

**TILA – Failure to Make a Reasonable and Good-Faith Determination of Ability to Repay**
**15 U.S.C. § 1639c(a); 12 C.F.R. § 1026.43**

111. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

112. Because the Point Contracts are residential mortgage loans, Defendants were prohibited from originating them without first making a reasonable and good-faith determination, based on verified and documented information, that each consumer had a reasonable ability to repay the loan according to its terms, including associated taxes, insurance, and assessments. 15 U.S.C. § 1639c(a)(1), (3).

113. Defendants chose not to make any such determination. Point Digital chooses not to verify a borrower's income, employment, or any assets other than the real property securing the loan. Point Digital underwrites only home value, equity, and credit score, and affirmatively advertises the absence of an income requirement. Point Digital extended the Bowens and Ms. Brown credit that imposed a thirty-year balloon obligation – layered atop pre-existing secured debts (Exs. 2F and 3F) – without assessing whether they could satisfy it at maturity, upon sale, or by refinancing, while acknowledging in its own disclosures that refinancing may be unavailable. Exs. 2A and 3A, at 1.

114. As a direct and proximate result, Plaintiffs and the Class are entitled to statutory damages, and the enhanced damages available for violations of § 1639c(a) – an amount equal to the sum of all finance charges and fees paid by the consumer – together with attorneys' fees and costs. 15 U.S.C. § 1640(a)(1)-(4).

115. Defendant Point Trust, as assignee, succeeds to the rights and liabilities and is jointly and severally liable under 15 U.S.C. § 1641 for all acts and omissions pleaded herein.

## COUNT III

### TILA – Prohibited Arbitration Clause; Declaratory Relief
### 15 U.S.C. § 1639c(e); Md. Code Ann., Cts. & Jud. Proc. §§ 3-401 *et seq.*

116. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

117. Federal law prohibits any residential mortgage loan from including terms that require arbitration or any other nonjudicial procedure to resolve any controversy arising out of the transaction, 15 U.S.C. § 1639c(e)(1), and separately prohibits the application of any contract term to bar a consumer from bringing a federal statutory claim in court, 15 U.S.C. § 1639c(e)(3).

118. The Point Contract violates both prohibitions. Paragraph 7.20.1 mandates binding arbitration of "any and all controversies, claims, or disputes with Point"; ¶ 7.20.6 waives class procedures in court and arbitration alike; and ¶ 7.19 waives trial by jury.

119. These provisions are void and unenforceable as applied to the Point Contracts, and an actual controversy exists between the parties concerning their enforceability.

120. As a result of the violations of TILA, pursuant to 15 U.S.C. § 1635(i) and § 1640, Plaintiffs, on behalf of themselves and the proposed class, seek: a declaration that the Point Contracts represent a residential mortgage loan under 15 U.S.C. § 1602 and that the arbitration clause is void per 15 U.S.C. § 1639c(e)(1).

## **COUNT IV**

### **Declaratory Judgment – Md. Code Ann. Cts. & Jud. Proc. §§ 3-401 *et seq.***

121. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

122. Maryland Law permits the circuit court to grant "declaratory judgment or decree in a civil case, if it will serve to terminate the uncertainty or controversy giving rise to the proceeding, and if: (1) an actual controversy exists between contending parties; (2) [a]ntagonistic claims are present between the parties involved… (3) [a] party asserts a legal relation, status, right, or privilege and this is challenged or denied by an adversary party." Md. Code Ann. Cts. & Jud. Proc. § 3-409(a).

123. Point Digital's failure to provide the disclosures required by TILA and its failure to evaluate borrowers' ability to repay the loan render each Point contract voidable. The purpose of TILA's required disclosures and repayment ability evaluation is to provide borrowers with a

complete understanding of their obligations under the Point loan agreement so that they can make an informed decision whether to bind themselves to Point's contract terms. Point's failure to follow TILA deprived the Plaintiffs and all similarly situated persons from making an informed choice.

124. As a result of the violations of TILA, Plaintiffs, on behalf of themselves and the proposed class, seek: a declaration that the Point Contracts are voidable under Md. Code Ann. Cts. & Jud. Proc §§ 3-409 and 3-412.

WHEREFORE, Plaintiffs respectfully request that the Court:

A. Enter an Order certifying the Class defined above, appointing Plaintiffs as class representatives, and appointing undersigned counsel as class counsel;

B. Enter an Order providing for any and all equitable, or declaratory relief the Court deems appropriate, including, but not limited to:

    a. Ordering that the Plaintiffs', and Class' loans be voidable , and at the borrower's discretion, with a requirement that the agreement be renegotiated so that the borrower repays only the principal "Investment Amount" within 24 months of the entry of the Order,

C. Enter an Order granting money damages and judgment in the maximum statutory amount available to the Class under 15 U.S.C. § 1640(a)(2)(B), which amount exceeds $75,000.00.

D. Enter an Order granting Plaintiffs and the Class the reasonable costs and expenses of the suit, including attorneys' fees. 15 U.S.C. § 1640(a)(3).

E. Grant such further relief as the Court may deem just and proper.

Dated: October 23, 2026

Respectfully submitted,

/s/

Michael Paul Smith, Esq. #9212170165
Eric R. Harlan, Esq. # 9412140038
Smith, Gildea & Schmidt, LLC
600 Washington Avenue, Suite 200
Towson, MD 21204
(410) 821-0070 / (410) 821-0071 (fax)
Email: mpsmith@sgs-law.com
Email: eharlan@sgs-law.com
*Counsel for Plaintiffs and Class Members*

## PRAYER FOR JURY TRIAL

Plaintiffs and Class Members hereby request a trial by jury on the foregoing Class Action Complaint.

/s/

Michael Paul Smith, Esq. #9212170165
Eric R. Harlan, Esq. # 9412140038
Smith, Gildea & Schmidt, LLC
600 Washington Avenue, Suite 200
Towson, MD 21204
(410) 821-0070 / (410) 821-0071 (fax)
Email: mpsmith@sgs-law.com
Email: eharlan@sgs-law.com
*Counsel for Plaintiffs and Class Members*